**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

ALTHEA CAMPBELL, and FRANCHESTA DACRES

INDEX NO.

Plaintiffs,

**CV 13-2392**

**JURY TRIAL DEMANDED**

- against -

THE CITY OF NEW YORK, a municipal entity, and
NEW YORK CITY POLICE OFFICERS: POLICE
OFFICER JAMES MCMAHON, and POLICE
OFFICER "JANE DOE"

**COMPLAINT**

**DEARIE, J.**

Defendants.

**AZRACK, M.J.**

-------------------------------------------------------------------X

Plaintiffs ALTHEA CAMPBELL, and FRANCHESTA DACRES ("Plaintiffs")
by their attorneys, STECKLOW COHEN & THOMPSON, complaining of the
defendants, respectfully allege as follows:

## I. PRELIMINARY STATEMENT

**1.**    Plaintiffs bring this action for compensatory damages, punitive damages and
attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their
civil rights, as said rights are secured by said statutes and the Constitutions of the State of
New York and the United States.

**2.**    At or around 12:00am on June 26, 2011 Plaintiff ALTHEA CAMPBELL and her
son's fiancee Plaintiff FRANCHESTA DACRES were driving and riding in Plaintiff
FRANCHESTA DACRES' car ("Plaintiffs' car") through Queens, New York. Plaintiffs
were en route to pick up Plaintiff FRANCHESTA DACRES' three-year-old son from a
relative's house ("the home") in the Laurelton neighborhood of Queens. Shortly after
arriving at the home, Plaintiff FRANCHESTA DACRES parked Plaintiffs' car in a
nearby driveway, as there were no parking spots available on the street. After
FRANCHESTA DACRES' relative brought her son out of the house, but not before
Plaintiff FRANCHESTA DACRES began pulling away from the home, Plaintiff

1

ALTHEA CAMPBELL noticed a van ("the van") that was parked nearby, blocking Plaintiff's car from backing out of the driveway. Plaintiff ALTHEA CAMPBELL noticed that the van was occupied by a man whom she had never met before ("Assailant"). After politely asking Assailant to move the van, Assailant, amongst other hostile actions, shoved Plaintiff ALTHEA CAMPBELL to the ground, and repeatedly struck her with a baseball bat. On seeing her mother-in-law-to-be assaulted by Assailant, Plaintiff FRANCHESTA DACRES called the police.

3.      Instead of arresting the man with the baseball bat who had been assaulting Plaintiff ALTHEA CAMPBELL, the Defendant POLICE OFFICERS handcuffed and arrested Plaintiffs ALTHEA CAMPBELL and FRANCHESTA DACRES, searched Plaintiffs' car without either Plaintiffs' consent or a warrant to do so, and took Plaintiff FRANCHESTA DACRES into custody and detained her for approximately twenty hours without telling her why she had been detained.

4.      In sum, Plaintiffs bring this claim in a quest for answers as to why they were subjected to abusive conduct by the same Defendant POLICE OFFICERS who were duly sworn to serve and protect them in the absence of any criminal or illegal conduct of any sort or type.

## II. JURISDICTION

5.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

6.      Plaintiff ALTHEA CAMPBELL and Plaintiff FRANCHESTA DACRES further invoke this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

7.      Venue is proper for the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because Defendant CITY OF NEW YORK because the incident occurred in the same district.

## IV. JURY DEMAND

8.      Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

9.      Plaintiff ALTHEA CAMPBELL is an American citizen and is currently a resident of Queens, New York.

10.     Plaintiff FRANCHESTA DACRES is an American citizen and is currently a resident of Queens, New York.

11.    Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

12.    Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, CITY OF NEW YORK.

13.    Defendant POLICE OFFICER JAMES MCMAHON, ("Defendant POLICE OFFICER JAMES MCMAHON"), at all times here relevant was a member of the New York City Police Department.

14.    Defendant POLICE OFFICER "JANE DOE", ("Defendant "Jane Doe" POLICE OFFICER), at all times here relevant was a member of the New York City Police Department.

15.    The physical identity, *sui generis*, of Defendant "Jane Doe" POLICE OFFICER at issue here is known to Plaintiffs at this time.

16.    Defendant "Jane Doe" POLICE OFFICER stood about 5'2", was of thick build, had curly hair that she was wearing at shoulder length, and a dark complexion at the time of the incident and arrest in question.

17.    Plaintiffs will amend this complaint to name Defendant "Jane Doe" POLICE OFFICER as her identity can be established to a reasonable certainty.

18.    That at all times hereinafter mentioned, Defendant POLICE OFFICER JAMES MCMAHON, and Defendant "Jane Doe" POLICE OFFICERS (collectively, "Defendant POLICE OFFICERS") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

19.    That at all times relevant to this action, Defendant POLICE OFFICERS, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

20.    Each and all of the acts of the Defendant POLICE OFFICERS alleged herein were done by said Defendants while acting within the scope and in furtherance of their employment by Defendant CITY OF NEW YORK.

## VI. FACTS COMMON TO ALL CLAIMS

21.    The events described herein took place on and after Sunday, June 26, 2011.

22.    On June 26, 2011, at or around 12:00am, Plaintiff ALTHEA CAMPBELL and her son's fiancee, Plaintiff FRANCHESTA DACRES drove Plaintiff FRANCHESTA DACRES' car ("Plaintiffs' car") from their residence in the Far Rockaway neighborhood of Queens, New York in order to pick up Plaintiff FRANCHESTA DACRES' three-year-old son.

**23.**   At this time, Plaintiff DACRES' son was at a relative's house ("the home") in the Laurelton neighborhood of Queens, New York.

**24.**   Plaintiff FRANCHESTA DACRES' ten-year-old nephew ("Nephew") was also in the car with Plaintiff ALTHEA CAMPBELL and Plaintiff FRANCHESTA DACRES.

**25.**   Shortly after arriving at the home, Plaintiff ALTHEA CAMPBELL and Plaintiff FRANCHESTA DACRES were unable to find a place to park on the street.

**26.**   As Plaintiff FRANCHESTA DACRES had only planned on quickly running into and out of the home, Plaintiff FRANCHESTA DACRES backed the car into a nearby driveway ("the driveway").

**27.**   At or around this time, the Plaintiffs' relative brought Plaintiff FRANCHESTA DACRES' son out of the home.

**28.**   At or around this time, Plaintiff ALTHEA CAMPBELL and Plaintiff FRANCHESTA DACRES noticed that a white-panel Ford van ("the van") had pulled up behind Plaintiffs' car, thereby blocking Plaintiffs' car's exit from the driveway.

**29.**   Plaintiff ALTHEA CAMPBELL waited for approximately five minutes as Plaintiff FRANCHESTA DACRES went into their relatives' home.

**30.**   Shortly thereafter, Plaintiff ALTHEA CAMPBELL stepped out of Plaintiff's car and approached the driver of the van ("Assailant").

**31.**   Assailant stepped out of the van.

**32.**   Plaintiff ALTHEA CAMPBELL approached Assailant cautiously and asked him, in sum and substance, "What's wrong, why did you leave your car blocking our car like that?"

**33.**   In response and nearly immediately thereafter, assailant shoved Plaintiff ALTHEA CAMPBELL.

**34.**   Plaintiff ALTHEA CAMPBELL then fell to the ground.

**35.**   Assailant then pulled out a keychain with a knife attached.

**36.**   Plaintiff ALTHEA CAMPBELL exclaimed in fear.

**37.**   Plaintiff ALTHEA CAMPBELL got up and ran back to Plaintiffs' car.

**38.**   At or around this time, Plaintiff FRANCHESTA DACRES walked out of the home and placed her son in Plaintiffs' car.

**39.**   At or around this time, Plaintiff FRANCHESTA DACRES —— having observed Assailant's acts of shoving Plaintiff ALTHEA CAMPBELL to the ground and pulling out a knife —— called the police.

**40.**   At or around this time, Assailant pursued Plaintiff CAMPBELL to Plaintiffs' car and reached into Plaintiff's car, grabbing a baseball bat from the Plaintiffs' car.

**41.**   Plaintiff ALTHEA CAMPBELL, at this time, was getting into Plaintiffs' car.

**42.** Assailant began repeatedly striking Plaintiff ALTHEA CAMPBELL's leg with the aforementioned bat.

**43.** Assailant threatened to use his knife against Plaintiff ALTHEA CAMPBELL and Plaintiff FRANCHESTA DACRES.

**44.** At or around this time, Plaintiff ALTHEA CAMPBELL, as a result of Assailant's act of striking her with the bat, fell to the ground between Plaintiffs' car and the van.

**45.** At or around this time, Defendant POLICE OFFICERS arrived in a marked police car.

**46.** Plaintiff ALTHEA CAMPBELL struggled to her feet and approached the Defendant POLICE OFFICERS.

**47.** As Plaintiff ALTHEA CAMPBELL approached the Defendant POLICE OFFICERS she began explaining how Assailant had recently struck and beaten her.

**48.** The Defendant POLICE OFFICERS did not respond to Plaintiff ALTHEA CAMPBELL.

**49.** Despite the fact that Plaintiff FRANCHESTA DACRES had called the Defendant POLICE OFFICERS to the home in order to receive their protection and assistance, the Defendant POLICE OFFICERS did not approach Plaintiff FRANCHESTA DACRES.

**50.** Instead, at or around this time, the Defendant POLICE OFFICERS approached Assailant and began speaking with him.

**51.** Shortly thereafter, either or both of the Defendant POLICE OFFICERS went back over to Plaintiff ALTHEA CAMPBELL and instructed her to stand with her hands behind her back.

**52.** Plaintiff ALTHEA CAMPBELL —— though wholly unaware of why the Defendant POLICE OFFICERS had ordered her to do so —— complied.

**53.** Moments later, one or both of the Defendant POLICE OFFICERS handcuffed Plaintiff ALTHEA CAMPBELL.

**54.** At or around this time, the Defendant POLICE OFFICERS searched Plaintiffs' car.

**55.** Neither Plaintiff ALTHEA CAMPBELL nor Plaintiff FRANCHESTA DACRES consented to the Defendant POLICE OFFICERS' search of Plaintiffs' car.

**56.** The Defendant POLICE OFFICERS did not have a warrant to search Plaintiffs' car.

**57.** The Defendant POLICE OFFICERS did not have probable cause to believe Plaintiffs' car contained any illegal or controlled substances.

**58.** Plaintiffs' car did not contain any illegal or controlled substances.

**59.** The Defendant POLICE OFFICERS did not have probable cause to believe Plaintiffs' car contained any weapons.

**60.**  Plaintiffs' car did not contain any weapons.

**61.**  Upon information and belief, there were no exigent circumstances presented that gave the Defendant POLICE OFFICERS grounds to search Plaintiffs' car without first obtaining Plaintiffs' consent or a warrant to do so.

**62.**  Nephew (ten-years-old) and Plaintiff FRANCHESTA DACRES' son (three-years-old) were waiting inside of Plaintiffs' car when the Defendant POLICE OFFICERS searched the same.

**63.**  Nephew and Plaintiff FRANCHESTA DACRES' son were frightened by the Defendant POLICE OFFICERS' act of searching Plaintiffs' car.

**64.**  At or around this time, Plaintiff FRANCHESTA DACRES —— having observed the Defendant POLICE OFFICERS outright ignore her mother-in-law-to-be's request for protection or assistance —— called for an ambulance.

**65.**  No ambulance ever arrived.

**66.**  As a result of the painful nature of the injuries that Plaintiff ALTHEA CAMPBELL received from being attacked by Assailant, she would later receive medical treatment at a hospital and be provided with a cane for walking.

**67.**  Approximately thirty minutes after one or more of the Defendant POLICE OFFICERS had handcuffed Plaintiff ALTHEA CAMPBELL, the Defendant POLICE OFFICERS again approached Plaintiff ALTHEA CAMPBELL and removed her handcuffs.

**68.**  The Defendant POLICE OFFICERS then told Plaintiff ALTHEA CAMPBELL that she had been handcuffed due to their mistaking her for someone else.

**69.**  Shortly thereafter, one or both of the Defendant POLICE OFFICERS approached, handcuffed and arrested Plaintiff FRANCHESTA DACRES.

**70.**  Plaintiff FRANCHESTA DACRES complied with all orders or commands that the Defendant POLICE OFFICERS issued to her.

**71.**  At or around this time, while in handcuffs, Plaintiff FRANCHESTA DACRES stated to Defendant POLICE OFFICER JAMES MCMAHON, in sum and substance, "I want to make a statement to you all in regards to what happened before you arrived."

**72.**  In response, Defendant POLICE OFFICER JAMES MCMAHON refused to take down a statement from Plaintiff FRANCHESTA DACRES.

**73.**  At no point before, during, or after Defendant POLICE OFFICER JAMES MCMAHON's refusal to take down a statement from Plaintiff FRANCHESTA DACRES did Defendant "Jane Doe" POLICE OFFICER volunteer or offer to take down a statement from either Plaintiff.

**74.**  At or around this time, Defendant "Jane Doe" POLICE OFFICER stated to Plaintiff FRANCHESTA DACRES, in sum and substance, "I think you and your entourage went to the home in order to assault the Assailant."

**75.** Plaintiff FRANCHESTA DACRES felt disrespected, hurt, embarrassed, and afraid of Defendant "Jane Doe" POLICE OFFICER after she made the above statement.

**76.** Plaintiff ALTHEA CAMPBELL and Plaintiff FRANCHESTA DACRES had driven to the home in order to pick up Plaintiff DACRES' three year old son from the home.

**77.** Plaintiffs were shocked by the outlandish accusations the Defendant "Jane Doe" POLICE OFFICER had levied against them.

**78.** It strains credibility to believe that an adult mother and her son's adult fiancee would travel with a young child to pick up another small child, and incidentally to commit assault on a grown man whom they had never met before.

**79.** At or around this time, Plaintiff FRANCHESTA DACRES asked either or both of the Defendant POLICE OFFICERS, in sum and substance, "Why are you arresting me?"

**80.** The Defendant POLICE OFFICERS did not respond.

**81.** Shortly thereafter, the Defendant POLICE OFFICERS put Plaintiff FRANCHESTA DACRES into the nearby police car and drove her to the 105th Precinct.

### THE DEFENDANT POLICE OFFICERS TRANSPORT PLAINTIFF FRANCHESTA DACRES TO AND DETAIN HER WITHIN THE 105th PRECINCT

**82.** After arriving at the 105th Precinct, Plaintiff FRANCHESTA DACRES again asked either or both of the Defendant POLICE OFFICERS, in sum and substance, "Can I give you a statement in regards to what happened back at the home before you all arrived?"

**83.** In response, Defendant POLICE OFFICER JAMES MCMAHON yelled at Plaintiff FRANCHESTA DACRES, in sum and substance, "We did not take any statement from you at the scene and we will not take any statement from you now!"

**84.** At or around this time, one or both of the Defendant POLICE OFFICERS put Plaintiff FRANCHESTA DACRES into a holding cell within the 105th Precinct.

**85.** Hours later, one or both of the Defendant POLICE OFFICERS removed Plaintiff FRANCHESTA DACRES from the same aforementioned holding cell and transported her to Queens central booking.

**86.** After approximately twenty (20) hours in custody, Plaintiff FRANCHESTA DACRES was informed that the District Attorney had declined to prosecute the charges preferred against her by the Defendant POLICE OFFICERS.

**87.** At or around this time, Plaintiff FRANCHESTA DACRES was released from central booking.

**88.** As a direct result of this this incident, Plaintiff FRANCHESTA DACRES and Plaintiff ALTHEA CAMPBELL have become fearful of the police.

**89.**   As a direct result of this incident, Plaintiff FRANCHESTA DACRES and Plaintiff ALTHEA CAMPBELL now hesitate to call police officers in situations in which either they or members of their family need help in an emergency.

**90.**   As a direct result of this incident, Plaintiff FRANCHESTA DACRES missed work the following Monday due to the stress, anguish, and anxiety of her arrest and detention.

**91.**   As a direct result of this incident, Plaintiff ALTHEA CAMPBELL suffered migraines for four days due to the stress, anguish, and anxiety that she and her family members suffered.

**92.**   Upon information and belief, the Defendant POLICE OFFICERS' arrest of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL were motivated wholly by the Defendant POLICE OFFICERS need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

**93.**   Upon information and belief, the Defendant POLICE OFFICERS' arrest of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL were motivated in part by the Defendant POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

**94.**   Upon information and belief, the Defendant POLICE OFFICERS' arrest of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL were motivated wholly by the Defendant POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK'S police department.

**95.**   Upon information and belief, the Defendant POLICE OFFICERS' arrest of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL were motivated in part by the Defendant POLICE OFFICERS' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK'S police department.

**96.**   The Defendant POLICE OFFICERS' particular arrest of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL are believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because they were undertaken in the absence of probable cause to handcuff or arrest.

**97.**   The Defendant POLICE OFFICERS' particular arrest of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL are believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because they were undertaken in a manner which indicated that the individual Defendant POLICE OFFICERS who participated in Plaintiffs' handcuffing and arrest made the determination to handcuff and/or arrest them before determining why they should be either handcuffed or arrested.

**98.**   The Defendant POLICE OFFICERS' particular arrest of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL are believed to have been

motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because Plaintiffs were handcuffed and/or arrested after it was already established that neither one of them were carrying any weapons or illegal substances, had any outstanding warrants against them, and were not engaging in illegal conduct of any kind just before the time of their handcuffing and/or arrest.

99.    The Defendant POLICE OFFICERS' particular arrest of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL are believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because the Defendant POLICE OFFICERS handcuffed and/or arrested Plaintiffs on the 26th day of June; hence, the Defendant POLICE OFFICERS faced an increased amount of pressure to assure that they satisfied their June quota requirements as only four days remained until the new month would begin.

100.   The Defendant POLICE OFFICERS' particular arrests of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL are believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are handcuffed and/or arrested in the absence of probable cause to handcuff and/or arrest, due to a perceived ease of prosecution of such minority individuals.

101.   The Defendant POLICE OFFICERS' particular arrests of Plaintiff FRANCHESTA DACRES and handcuffing of Plaintiff ALTHEA CAMPBELL are believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are handcuffed and/or arrested in the absence of probable cause to handcuff and/or arrest, due to a perceived ease of prosecution of such minority individuals, because the Defendant POLICE OFFICERS handcuffed and/or arrested Plaintiffs after it was already established that they were not carrying any weapons or illegal substances, and did not have any outstanding warrants against them.

102.   Said otherwise, the Defendant POLICE OFFICERS, through their actions, carried out a discriminatory application of such laws, driven by a discriminatory motivation of what might otherwise be facially neutral statutes due to a perceived ease of prosecution.

103.   As a result of the aforementioned conduct, the Defendant POLICE OFFICERS have violated Plaintiff ALTHEA CAMPBELL's and Plaintiff FRANCHESTA DACRES' constitutional rights to equal protection, and thus Plaintiffs are entitled to seek redress under 42 U.S.C. § 1983 and are further entitled to injunctive relief to the extent necessary to prevent further disparate treatment and retaliation.

104.   Further information demonstrating that the above-pled constitutionally impermissible conduct of Defendants occurred pursuant to policies, customs or practices adopted, promulgated, tacitly ratified and/or condoned by Defendant CITY OF NEW YORK and its senior policymakets can be found in the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS."

105.   As a result of the above constitutionally impermissible conduct, Plaintiff ALTHEA CAMPBELL and Plaintiff FRANCHESTA DACRES were caused to suffer

personal injures, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, and damage to their reputation and standing within their communities.

**106.** As a result of Defendants' impermissible conduct, Plaintiff ALTHEA CAMPBELL and Plaintiff FRANCHESTA DACRES demand judgment against Defendants in a sum of money to be determined at trial.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

**107.** Plaintiffs repeat, reiterate and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**108.** All of the aforementioned acts of Defendant CITY OF NEW YORK, and the Defendant POLICE OFFICERS and their agents, servants and employees, were carried out under the color of state law.

**109.** All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

**110.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

**111.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department ("NYPD"), all under the supervision of ranking officers of said department.

**112.** The Defendant POLICE OFFICERS, and Defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**113.** As a result of the above constitutionally-impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and loss of wages, and damage to their reputations and standings within their communities.

**114.** As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

**115.** Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**116.** As a result of the aforesaid conduct by Defendants, Plaintiff FRANCHESTA DACRES was subjected to illegal, improper and false arrests by the Defendants and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

**117.** As a result of the aforesaid conduct by Defendants, Plaintiff ALTHEA CAMPBELL was subjected handcuffed despite the Defendants not having probable cause, privilege, or consent to do so.

**118.** As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages and damage to their reputations and standing within their communities.

**119.** As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF
## EXCESSIVE USE OF FORCE UNDER 42 U.S.C. §1983

**120.** Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**121.** Defendants utilized excessive force in handcuffing Plaintiff ALTHEA CAMPBELL without probable cause for her arrest.

**122.** Defendants utilized excessive force in handcuffing Plaintiff FRANCHESTA DACRES without probable cause for her arrest.

**123.** Defendants utilized excessive force in detaining Plaintiff FRANCHESTA DACRES for approximately twenty hours.

**124.** At no point during the above-mentioned actions did the circumstances presented to the Defendant POLICE OFFICERS support any of the above applications of force on Plaintiffs.

**125.** Plaintiffs were subjected to excessive force and were assaulted by the Defendant POLICE OFFICERS, in violation of their rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

**126.** As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress,

anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, and damage to their reputations and standings within their communities.

**127.** As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

**128.** Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**129.** Each individual Defendant POLICE OFFICER had an affirmative duty to intervene on the Plaintiffs' behalf in order to prevent the violation of Plaintiffs' constitutional rights.

**130.** Each individual Defendant POLICE OFFICER failed to intervene on Plaintiffs' behalf in order to prevent the violation of Plaintiffs' constitutional rights despite having had a realistic opportunity to do so.

**131.** Each individual Defendant POLICE OFFICER failed to intervene on Plaintiffs' behalf in order to prevent the violation of Plaintiffs' constitutional rights despite having substantially contributed to the circumstances within which the Plaintiffs' rights were violated by the Defendant POLICE OFFICERS' affirmative conduct.

**132.** Each individual Defendant POLICE OFFICER failed to intervene on Plaintiffs' behalf in order to prevent the violation of their constitutional rights despite their awareness that Plaintiffs' rights were being violated.

**133.** As a result of the aforementioned conduct of the individual Defendant POLICE OFFICERS, Plaintiffs' constitutional rights were violated.

**134.** As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, and damage to their reputations and standings within their communities.

**135.** As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM THE MUNICIPAL DEFENDANTS' PROMULGATION OF UNCONSTITUTIONAL ARREST QUOTAS UNDER 42 U.S.C. §1983

**136.** Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**137.** Plaintiffs also incorporate herein by reference the contents of the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS."

**138.** The Defendant POLICE OFFICERS handcuffed Plaintiff ALTHEA CAMPBELL and arrested and detained Plaintiff FRANCHESTA DACRES in the absence of any evidence of criminal wrongdoing by either Plaintiff, notwithstanding their knowledge that said handcuffing, arrest, and detainment would jeopardize the Plaintiffs' liberty, wellbeing, safety, and constitutional rights

**139.** The acts complained of were carried out by the aforementioned Defendant POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

**140.** The acts complained of were carried out by the aforementioned individual Defendant POLICE OFFICERS in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the CITY OF NEW YORK and the NYPD, all under the supervision of ranking officers of said department.

**141.** The aforementioned customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK and the NYPD include, but are not limited to, the following unconstitutional practices:

a) wrongfully arresting individuals without probable cause due to perceived lack of respect for the police officer (i.e., "contempt of cop" arrests);

c) wrongfully arresting innocent persons in order to meet quantitative "productivity goals" (i.e., arrest quotas).

d) wrongfully arresting persons without probable cause due to perceived lack of respect for the police officer; in retaliation for First Amendment protected expression (i.e., "contempt of cop" arrests in retaliation for First Amendment protected expression).

**142.** Upon information and belief, the arrests of Plaintiffs were motivated wholly by the Defendants' need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

**143.** Upon information and belief, the arrests of Plaintiffs were motivated in part by the Defendants' need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

**144.** Upon information and belief, the arrests of Plaintiffs were motivated wholly by the Defendants' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

**145.** Upon information and belief, the arrests of Plaintiffs were motivated in part by the Defendants' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

**146.** The particular arrests of Plaintiffs are believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because they were undertaken in the absence of probable cause to arrest.

**147.** As a result of the aforementioned conduct of the Defendants, Plaintiffs' constitutional rights were violated.

**148.** As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, and damage to their reputations and standings within their communities.

**149.** As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### EQUAL PROTECTION UNDER 42 U.S.C. § 1983

**150.** Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**151.** Plaintiffs also incorporate herein by reference the contents of the appendix attached hereto, "ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS."

**152.** At all times described herein, Plaintiffs were possessed of the right to equal protection under the laws, as guaranteed under the 14th Amendment to the United States Constitution.

**153.** The Defendants arrested and incarcerated Plaintiffs in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrests and incarcerations would jeopardize Plaintiffs' liberty, well-being, safety and constitutional rights.

**154.** The acts complained of were carried out by the Defendants in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

**155.** The acts complained of were carried out by the Defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

**156.** Plaintiffs were falsely accused of crimes and violations and were taken into Police custody and detained against their wills.

**157.** That the actions of the Defendants, heretofore described, constituted unlawful detention, imprisonment, assault, and battery and were designed to and did cause mental harm, pain, and suffering both in violation of Plaintiffs' Constitutional rights as

guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for the Plaintiffs' exercise of their civil and constitutional rights of free speech, and free expressive association as guaranteed by the First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

**158.** As a result of the Defendants' constitutionally impermissible conduct, Plaintiffs suffered, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, and damage to their reputation and standing within their communities.

**159.** As a result of Defendants' impermissible conduct, Plaintiffs demands judgment against Defendants in a sum of money to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
## RETALIATION FOR FIRST AMENDMENT
## PROTECTED EXPRESSION UNDER 42 U.S.C. § 1983

**160.** Plaintiffs repeat, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**161.** At or around the time that Plaintiffs came into contact with the Defendant POLICE OFFICERS, they engaged in protected speech or conduct.

**162.** Plaintiffs, on multiple occasions, requested that the Defendant POLICE OFFICERS take down a statement or report regarding the incidents described herein.

**163.** Upon information and belief, the Defendant POLICE OFFICERS took adverse action against Plaintiffs in order to retaliate against them for requesting that the Defendant POLICE OFFICERS take down a statement or report of the incidents described herein.

**164.** The Defendant POLICE OFFICERS took adverse action against Plaintiffs in order to punish them for engaging in protected speech and conduct.

**165.** The Defendant POLICE OFFICERS took adverse actions against Plaintiffs by using wrongful and unjustified force upon them.

**166.** The Defendant POLICE OFFICERS handcuffed Plaintiff ALTHEA CAMPBELL without probable cause for arresting her.

**167.** The Defendant POLICE OFFICERS took adverse action against Plaintiff FRANCHESTA DACRES by arresting her without probable cause to do so.

**168.** The Defendant POLICE OFFICERS took adverse action against Plaintiff FRANCHESTA DACRES by falsely accusing him of crimes and violations.

**169.** Defendants took adverse action against Plaintiff FRANCHESTA DACRES by taking him into Police custody and detaining her against her will.

**170.** Upon information and belief, there was a causal connection between the protected speech and conduct engaged in by Plaintiffs and the adverse actions taken by the Defendant.

**171.** The causal connection between the protected speech and conduct engaged in by Plaintiffs and the adverse actions taken against them by the Defendant POLICE OFFICERS was demonstrated by, among other things, the fact that the Defendant POLICE OFFICERS used excessive force against Plaintiffs in the absence of justification.

**172.** Plaintiff FRANCHESTA DACRES was taken into police custody and detained her against her will.

**173.** The actions of the Defendant POLICE OFFICERS heretofore described, constituted unlawful detention, imprisonment, assault and battery and were designed to and did cause bodily harm, pain and suffering both in violation of Plaintiffs constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for their exercise of their civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

**174.** That the conduct and actions of the Defendant POLICE OFFICERS, acting under color of State law, were done intentionally, maliciously, and/or with a reckless disregard for the natural and probable consequences of their acts, were done without lawful justification, and were designed to and did cause bodily harm, pain and suffering both in violation of the Plaintiffs' Constitutional rights as guaranteed under 42 U.S.C. §1983, the United States Constitution, First, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for Plaintiffs exercise of their civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

**175.** The Defendant POLICE OFFICERS deprived Plaintiffs of their liberty in violation of both their civil and constitutional rights, as guaranteed under 42 U.S.C. §1983 and set forth in the United States Constitution, First, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for his exercise of his civil and constitutional rights of free speech, free expression and

expressive association as guaranteed by First and Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

**176.** The Defendant POLICE OFFICERS' actions were undertaken under color of law and would not have existed but for the Defendant POLICE OFFICERS using their official power.

**177.** The Defendant POLICE OFFICERS, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiffs.

**178.** The Defendant POLICE OFFICERS, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers, and were directly responsible for the violation of Plaintiffs' constitutional rights.

**179.** All of the foregoing acts by the Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK deprived Plaintiffs of federally protected rights, including, but not limited to, the right:

> A. Not to be deprived of liberty without due process of law;
>
> B. To be free from seizure and arrest not based upon probable cause;
>
> C. To free speech and expression; and
>
> D. To receive equal protection under the law.

**180.** As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to their reputations and standings within their communities.

**181.** As a result of the Defendant POLICE OFFICERS and Defendant THE CITY OF NEW YORK's impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:      New York, New York
            April 19, 2013

Respectfully submitted,

SAMUEL B. COHEN [SC 7406]
STECKLOW COHEN & THOMPSON
10 SPRING STREET – SUITE 1
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
SAM@WYLIELAW.COM
ATTORNEYS FOR PLAINTIFF

## APPENDIX: ADDITIONAL FACT PLEADINGS IN SUPPORT OF MONELL CLAIMS

**1.**     Upon information and belief, Defendant CITY OF NEW YORK has had notice of, and tacitly condoned, its police officers' proffering of pretextual and false charges for personal vindication and/or to putatively justify improper uses of force against civilians.

**2.**     In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

**3.**     On February 28, 2008, the Seattle Post-Intelligencer published an investigative review of six (6) years of Seattle Municipal Court files, wherein the Post-Intelligencer's investigators found that African-Americans in that predominantly Caucasian city were arrested solely on charges of "obstructing a public officer" and related crimes such as resisting arrest eight times as often as Caucasians.[1]

**4.**     The Seattle Post-Intelligencer's investigative review cited above also found that the Seattle City Attorney's Office dropped nearly half of all Seattle criminal cases predicated solely on charges of "obstructing a public officer" and related crimes such as resisting arrest between January 2002 and 2008.  See fn1.

**5.**     In response to Seattle Police officers' questionable arrest activities discussed above, "Leo Poort, the [Seattle Police] department's legal adviser, included warnings about obstruction arrests in... his top twelve (12) tips to officers for 'avoiding civil liability lawsuits.' 'Don't arrest for 'contempt' of cop,' he wrote in tip No. 3. 'Officers must be thick skinned and not unduly influenced by the attitudes of persons they contact. Flunking the 'attitude' test (is) not a bookable offense.'" See fn1.

**6.**     In a review of San Jose criminal cases published on October 31, 2009, the San Jose Mercury News reported that the Santa Clara County Prosecutor declined to prosecute over one-third (33.33...%) of resisting arrest cases brought by San Jose police,

---

[1] Nalder, Kamb and Lathrop, *"Blacks Are Arrested on 'Contempt of Cop' Charge at Higher Rate,"* Seattle Post-Intelligencer,  February 28, 2008.  Article incorporated herein by reference and available online at
http://www.seattlepi.com/local/353020_obstructmain28.asp

a rate that is markedly disproportionate to the Santa Clara County Prosecutor's general twenty percent (20%) decline-to-prosecute rate.[2]

7.    The San Jose Mercury News investigation cited above also found that the San Jose Police Department did not sustain or substantiate civilian complaints with respect to any of the ninety-nine (99) use-of-force cases that it reviewed in 2008, even though the San Jose Independent Police Auditor disagreed with police findings in twenty-five (25) of those 99 cases. See fn2.

8.    In response to the San Jose Mercury News investigation cited above, the San Jose Police Department instituted a new policy of tracking arrests where it appears that resisting arrest is being used as a cover charge to justify unnecessary and excessive police uses of force on civilians. See fn2.

9.    A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant CITY OF NEW YORK did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest.[3]

10.    A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant CITY OF NEW YORK did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest, despite considerable anecdotal evidence that New York City Police Officers were arresting individuals on those and other like charges to justify use of force and/or to punish those individuals for "contempt of cop." See fn3.

11.    The above-cited New York Times special report noted that Los Angeles had already instituted a system for tracking the initiation and dispositions of "contempt of cop" and "cover charge" charges such as resisting arrest and disorderly conduct as of the time of that article's publication in 1997.  See fn3.

12.    Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing decades-old custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the

---

[2] Webby, Sean, "Mercury News investigation: San Jose police often use force in resisting-arrest cases," San Jose Mercury News, October 31, 2009.  Article incorporated by reference herein and available online at http://www.mercurynews.com/top-stories/ci_13686438?nclick_check=1
[3] Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report.; Disrespect as Catalyst for Brutality," New York Times, November 19, 1997.  Article incorporated by reference herein and available online at http://query.nytimes.com/gst/fullpage.html?res=9807E7D9163BF93AA25752C1A961958260&scp=8&sq=contempt+of+cop&st=cse&pagewanted=all.

improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

13.    Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

14.    Upon information and belief, and despite due and repeated notice that New York City Police Officers such as the Defendant POLICE OFFICERS have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant CITY OF NEW YORK has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

15.    Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations for personal vindication and/or as pretexts to justify use of force, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges.

16.    Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges.

17.    Upon information and belief, and despite due and repeated notice that New York City Police Officers such as the Defendant POLICE OFFICERS have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant CITY OF NEW YORK has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City Police

Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

## UNCONSTITUTIONAL ARREST QUOTAS ILLEGALLY IMPLEMENTED BY THE NEW YORK CITY POLICE DEPARTMENT

**18.**   Upon information and belief, police officers in the New York City Police Department, including the Defendant POLICE OFFICERS, are trained, ordered or encouraged to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

**19.**   Said quantitative enforcement "productivity goals" can also be referred to as arrest quotas.

**20.**   The need to meet arrest quotas can induce police officers to make arrests in the absence of probable cause.

**21.**   Upon information and belief, the arrest quotas promulgated by Defendant CITY OF NEW YORK induce New York City police officers, such as the Defendant "John Doe" POLICE OFFICERS herein, to make arrests in the absence of probable cause, in violation of the constitutional rights of individuals to be free from unreasonable seizures.

**22.**   The existence of the aforesaid unconstitutional arrest quota custom and/or policy was confirmed as a finding of fact when, on February 18, 2011, the jury in *Bryant v. City of New York*, Kings County Supreme Court Docket #022011/2007, found that the plaintiff in that case's arrest had resulted from a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest" imposed by Defendant City of New York.

**23.**   The existence of the aforesaid unconstitutional arrest quota custom and/or policy may additionally be inferred from repeated occurrences of similar wrongful conduct, as documented in lawsuits including but not limited to the following civil rights actions filed against the City of New York:

- *Alvin Williams v. The City of New York et al.,* United States District Court, Southern District of New York, 05 CV 4013.

- *Corey Williams v. The City of New York et al.,* United States District Court, Eastern District of New York, 07 CV 5362.

**24.**   The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the admission by Deputy Commissioner Paul J. Browne, as reported by the media on November 8, 2010, that commanders are permitted to set

"productivity goals."[4]

**25.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn. See fn5.

**26.** Attached hereto as **Exhibit "A"** are copies of the quantitative target sheets obtained from the 77th Precinct by or on behalf of the New York Daily News, as referenced in the aforesaid November 8, 2010 New York Daily News article.

**27.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tapes recordings acquired by WABC-TV/DT, including, among other admissions, a 41st precinct sergeant explaining that each of his officers is held to a twenty summons per month and one arrest per month enforcement quota, as reported by the media on March 3, 2010.[5]

**28.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make "special" arrests as directed by their superiors even if they must void the arrests at the end of their shifts, as reported by the media on May 11, 2010.[6]

**29.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the full page color advertisement placed by the Patrolmen's Benevolent Association of the City of New York in the May 7, 2012 edition of the New York Daily News, which states "Don't Blame the Cop[,] Blame NYPD Management For the pressure to write summonses and the pressure to convict motorists[.]  Because of ticket quotas, New York City police officers are being pressured to write summonses to as many motorists as possible…. "  A reproduction of the advertisement in question is attached hereto as **Exhibit "B."**

**30.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may still further be inferred from an report by the New York Daily News

**31.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred to have continued to the present date from the May 16, 2012

---

[4] Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

[5] Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.

[6] Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town." Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

opinion granting class certification in *Floyd et al. v. The City of New York et al.*, SDNY 08-CV-1034 (SAS) [Document 206], in which the Honorable District Judge Shira A. Scheindlin noted the existence of a Police Officer Performance Objectives Operations Order dated October 17, 2011, in which "Commissioner Kelly directed all commands that 'Department managers **can** and **must** set performance goals,' relating to 'the issuance of summonses, the stopping and questioning of suspicious individuals, and the arrests of criminals.'" *Floyd* Document 206 at 18-19, citing 10/17/11 Police Officer Performance Objectives Operations Order.  (emphasis in original)

## DEFENDANT POLICE OFFICERS' VIOLATION OF PLAINTIFFS' RIGHTS TO EQUAL PROTECTION UNDER THE U.S. CONSTITUTION'S 14TH AMENDMENT AND DEFENDANT CITY OF NEW YORK'S NOTICE OF SAME

**32.**   On March 1, 2010, the New York Times published an Op-Ed piece entitled "Watching Certain People," wherein the author cited to New York City Police Department Statistics showing that of the 2,798461 stops made by police officers during the years 2004 through 2009, African-American men accounted for 1,444,559 of those stops, and Hispanics accounted for 843,817 of those stops, or 51.6 percent and 30.1 percent, respectively.  The vast majority of those stopped, 88.2 percent, were not guilty of any crime.[7]

**33.**   On February 22, 2011, the New York Daily News published an article citing New York Police Department stops for the year 2010, which numbered 601,055.  This figure marked a 4.3 percent increase from the year 2009, and African-American and Latino men accounted for approximately 85 percent of all stops.[8]

**34.**   The particular arrests of Plaintiffs are believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals.

---

[7] Herbert, Robert, "Watching Certain People," New York Times, March 1, 2010Seattle Post-Intelligencer, February 28, 2008.  Article incorporated herein by reference and available online at:
http://www.nytimes.com/2010/03/02/opinion/02herbert.html?scp=7&sq=police%20stop%20frisk%20african%20american%20men&st=cse

[8] Parascandola, Rocco, "New York Police Department Stopped More than 600,000 in 2010, the Highest Number Ever Recorded, February 22, 2011.  Article incorporated herein by reference and available online at: http://articles.nydailynews.com/2011-02-22/news/29442269_1_latino-men-fight-crime-new-yorkers

35.    The particular arrests of Plaintiffs are believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals, because the Defendants, arrested Plaintiffs despite their observations that Plaintiffs were not carrying any weapons or illegal substances, and did not have any outstanding warrants against them.

36.    The particular arrests of Plaintiffs are believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease or prosecution of such minority individuals, because the Defendants, arrested Plaintiffs despite the fact that Plaintiffs had neither used offensive language toward Defendants nor in any way threatened the use of force against Defendants.

37.    The Defendants through their actions carried out a discriminatory application of such laws, driven by a discriminatory motivation of what might otherwise be facially neutral statutes due to a perceived ease of prosecution.

38.    As a result of the aforementioned conduct, the Defendants have violated Plaintiffs' constitutional rights to equal protection, and Plaintiffs are entitled to seek redress under 42 U.S.C. §1983, and are further entitled to injunctive relief to the extent necessary to prevent further disparate treatment and retaliation.

39.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by Plaintiffs as alleged herein.

40.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by Plaintiffs as alleged herein.

41.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, Plaintiffs were subjected to excessive force, false arrest, and excessive and unnecessary detention.

**DEFENDANT CITY OF NEW YORK'S AWARENESS AND ACQUIESCENCE
TO NYPD OFFICERS CONTINUING CUSTOM AND PRACTICE OF
RETALIATING AGAINST INDIVIDUALS WHO ARE DOCUMENTING,
OBSERVING, AND/OR COMMENTING UPON AN ARREST AND ITS
FAILURE TO ADEQUATELY TRAIN OR OTHERWISE PREVENT ITS
OFFICERS FROM ENGAGING IN THE SAME**

42.      The aforesaid actions and other like actions were undertaken by the NYPD in flagrant violation of the terms of the consent decree entered in Black et al. v. Codd et al., United States District Court, Southern District of New York, 73 Civ. 5283 ("Consent Decree").

43.      The Consent Decree states at 2 that: "[n]one of the following constitutes probable cause for the arrest or detention of an onlooker [to a police action] unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated: (a) Speech alone, even though crude and vulgar; (b) Requesting and making notes of shield numbers and names of officers; (c) Taking photographs; (d) Remaining in the vicinity of the stop or arrest."

44.      This understanding memorialized in the Consent Decree is codified in the NYPD Patrol Guide at PG §208-03, subsection "Observers At The Scene of Police Incidents."

45.      One recent example of members of the NYPD taking retaliatory action for documenting police activity is chronicled in a recent "Gawker" article, "NYPD Officers Arrest Couple for Dancing Inside Deserted Subway Station", wherein in the police officers approached Caroline Stern and her boyfriend George Hess and told them, "'You can't [dance] on the subway platform' [and then] asked the couple for ID."[9]

46.      Shortly thereafter, "Hess meanwhile pulled out a camera to record the exchange 'And that's when they called for backup' Stern said. Eight officers 'came from out of nowhere,' she recalled, both were cuffed, and [later] charged with disorderly conduct for 'impeding the flow of traffic', even through there were allegedly only three other people on the platform at the time [and] ultimately all charges were dropped." See fn9.

_____

[9] Zimmerman, Neetzen "NYPD Officers Arrest Couple for Dancing Inside Deserted Subway Station" Gawker, July 9, 2012
Article incorporated herein by reference and available online at:
http://gawker.com/5924534/nypd-officers-arrest-couple-for-dancing-inside-deserted-subway-station

**47.**     Despite due and repeated notice of the First Amendment rights of citizens in the vicinity of police actions, those same rights have been disregarded flagrantly and repeatedly by the Defendant CITY OF NEW YORK and the New York Police Department.


DATED:      New York, New York
            April 19, 2013



                        Respectfully submitted,


                        SAMUEL B. COHEN [SC 7406]
                        STECKLOW COHEN & THOMPSON
                        10 SPRING STREET – SUITE 1
                        New York, New York 10012
                        [212] 566-8000
                        [212] 202-4952/FAX
                        SAM@WYLIELAW.COM
                        ATTORNEYS FOR PLAINTIFF

**EXHIBIT A**

**GOOD DAY WE NEED THE FOLLOWING FOR THE WEEK: 4/5-4/11**

CELLPHONE    60
SEATBELTS    50
DBL PKS.     65
BUS STOPS    40
TINTS        25
TRUCK RTES   2

PLEASE HAVE SUMMONS ISSUED AT APL'S:
ST JOHNS SCHENECTADY
UTICA/ST MARKS
EPKWY/WASHINGTON
PARK/VANDERBILT
EPKWY/ALBANY
*Please be advised these are new apl locations*

PLEASE ISSUE HANDICAPPED SUMMONS ON ALL TOURS

THANK YOU

10/18/10

FOR THE WEEK OF 10/18- 10/24 WE NEED:

DBL PKRS     25
BUS STOPS    15
SEATBLTS     50
CELLPHNS     75
TINTS         6
TRUCK RTE     5

Thank you,

**EXHIBIT B**

